IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Civil Action No: |
| ex rel. Jacque Lee, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **FILED UNDER SEAL** |
| | ) | **PURSUANT TO** |
| v. | ) | **31 U.S.C. §3730(b)(2)** |
| | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Vanguard Health Services, Inc., a | ) | |
| Tennessee for profit corporation, | ) | **DO NOT ENTER ON PACER** |
| MedSynergies, Inc., a Texas for profit | ) | |
| corporation, Vanguard Physician | ) | |
| Services, LLC, a Delaware limited liability | ) | **JURY TRIAL DEMANDED** |
| company, Abrazo Health Systems, a | ) | |
| subsidiary of Vanguard Health Services, | ) | |
| Arizona Heart Institute, LLC, an Arizona | ) | |
| Limited Liability Company, | ) | |
| | ) | |
| jointly and severally, | ) | |
| Defendants. | ) | |

_____

George E. Barrett
David W. Garrison
Scott P. Tift
Seth M. Hyatt
BARRETT JOHNSTON, LLC
217 Second Avenue North
Nashville, TN 37201
(615) 244-2202
(615) 252-3798 (fax)
gbarrett@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com
shyatt@barrettjohnston.com

J. Marc Vezina (P76232)
Monica P. Navarro (P52985)
Michelle D. Bayer (P55546)
Vezina Law, PLC                              :
280 N. Old Woodward Ave
Suite LL20
Birmingham, MI 48009
(248) 558-2700
(248) 232-1581 (fax)
jmv@vezinalaw.com
mnavarro@vezinalaw.com
mbayer@vezinalaw.com

_____

# FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      As more fully alleged herein, this action arises out of a scheme or schemes to defraud the United States of America wherein Defendants have and currently knowingly engage and allowed and currently allow its subsidiaries to engage in improper billing to governmental programs for up-coded procedures, services performed by improperly supervised  employees, and services that are the result of referrals and compensation arrangements that violate the Anti-Kickback and Stark statutes.

2.      Relator notified Defendants of the wrongful practices and sought to stop them to no avail.

3.      Upon information and belief, the conduct which is the subject of this lawsuit is pervasive throughout Vanguard Health Systems' ("Vanguard") nationally, including its subsidiaries and joint ventures.

4.      These acts constitute violations of the Federal False Claims Act, 31 USC § 29 *et seq.* ("FCA").  The FCA provides, *inter alia*, that any person who knowingly presents and/or causes to be presented to the United States a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000.00 for each claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. §3729.  The FCA also allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government and to share in any recovery.  31 U.S.C. §3730.

2

5.     Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

**6.**     As required by the FCA, Relator voluntarily submitted prior to the filing of this Complaint a confidential written disclosure statement (subject to the attorney client privilege) to the United States Government, containing materials, evidence, and information in her possession pertaining to the allegations contained in this Complaint.

## PARTIES

**Defendants**

7.     Defendant Vanguard is a privately held, for-profit, healthcare management company based in Nashville, Tennessee.

8.     Defendant Vanguard owns (in whole or in part) and operates hospitals, other healthcare facilities, and medical provider networks across the country, including Arizona, Illinois, Massachusets, Michigan, and Texas.

9.     Defendant Vanguard's business model consists of purchasing or developing business ventures with hospital systems and medical provider groups across the country and then taking over their operations, including billing, contracting, finance, purchasing, human resources, and community relations.

10.     On July 1, 2012, Defendant Vanguard merged with Defendant MedSynergies, Inc. ("MedSyndergies") to create Defendant Vanguard Physicians Services, LLC ("VPS").

3

11. Defendant MedSynergies is a privately held Texas corporation, headquartered in Irving, Texas.

12. Defendant MedSynergies has partnerships with healthcare organizations and physicians around the country to provide expertise in the areas of revenue cycle management, practice management, consulting services, business process analysis, and software integration solutions.

13. Defendant VPS is owned 40% by MedSynergies and 60% by Vanguard.

14. Defendant VPS is a Delaware limited liability company headquartered in Houston, Texas, which owns healthcare entities in Arizona, Michigan, Texas, Massachusetts, and Illinois.

15. Defendant Vanguard does business in Arizona under the dba Abrazo Health Systems.

16. Abrazo Health Systems consists of Defendant VPS, Defendant Arizona Health Institute ("AHI") and Abrazo Healthcare.

17. Abrazo Healthcare owns six (6) hospitals in the Phoenix, Arizona metropolitan area: Arizona Heart Hospital, Arrowhead Hospital, Maryvale Hospital, Paradise Valley Hospital, Phoenix Baptist Hospital, and West Valley Hospital. All of these entities are run by the parent organization Vanguard.

18. Defendant AHI is an Arizona Limited Liability Company located in Phoenix, Arizona.

19. Defendant AHI is a cardiology practice and offers diagnostic testing, treatment, and rehabilitation for heart, vascular and vein issues.

20.     Defendant AHI was purchased by Vanguard in 2010 and was Vanguard's first foray into owning cardiology practice.

**The Relator**

21.     Relator, Jacque Lee, is a Healthcare Management Professional with over twenty-seven years of experience in the industry.

22.     Since February of 2012, Relator has been employed with MedSynergies.

23.     Relator is based out of her home in Las Vegas and is sent by her employer, MedSynergies, to its various health systems across the country to perform her work duties.

24.     In July 2012, Relator was sent to Phoenix, Arizona to support MedSynergies's business operations that are co-owned with Vanguard and which are operated under the Abrazo Health Systems umbrella.

25.     Relator spent nine weeks on assignment at Arizona Heart Institute ("AHI") a cardiology practice under Abrazo Health Systems.

26.     While at AHI, Relator discovered serious compliance violations occurring there.

27.     Relator is an original source of the facts and information set forth herein concerning the activities of the Defendants relative to the scheme to bill governmental programs for services which are more complex than what was provided (i.e. upcoding); to bill governmental programs for services that were performed by improperly supervised or unqualified staff; and to bill for services that are tainted by excessive compensation and inducements for referrals in violation of the Anti-kickback and Stark Statutes.

28.     Relator seeks to recover damages and civil penalties in the name of the United States for the violations alleged herein.

## JURISDICTION AND VENUE

29.     Under §3732 of the FCA, this Court has exclusive jurisdiction over the actions brought under the FCA and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under the FCA.

30.     Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. §1331 because this civil action arises under the laws of the United States.

31.     This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the claims arising under the federal False Claims Act that they form part of the same case or controversy. 28 U.S.C. §1367.

32.     Venue is proper in this district pursuant to §3732(a) of the Act, which provides that any action under §3730 may be brought in any judicial district in which the Defendant or in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any act proscribed by §3729 occurred.

33.     The acts that are the subject of this action occurred in the State of Arizona, within this judicial district, as well as nationwide, and occurred with the direct knowledge, and in many instances at the direction, consent, and acquiescence of Defendant Vanguard employees at its corporate headquarters.

34.     At all times material thereto, at least one Defendant, Vanguard, regularly conducts substantial business within the State of Tennessee, maintains permanent

employees in the State of Tennessee, and made, and is making, significant sales and claims for reimbursement within the State of Tennessee, within this judicial district.

35. Additionally, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1)-(2).

## GENERAL ALLEGATIONS

36. Defendant AHI is a cardiology practice located in Phoenix, Arizona, which offers diagnostic testing, treatment, and rehabilitation for heart, vascular and vein issues.

37. Defendant AHI was purchased by Vanguard in 2010.

38. In 2012, Defendant Vanguard partnered with Defendant MedSynergies to create Defendant Vanguard Physicians Services, LLC ("VPS").

39. AHI is part of Abrazo Health Systems (Vanguard's alter ego in Arizona) and operates under the oversight of VPS.

40. AHI has 4 locations: Main Campus 2632 North 20th Street Phoenix, AZ 85006; AHI-Parkway 6565 E. Greenway Parkway, Suite 102 Scottsdale, AZ 85254; AHI-Payson 708 S. Coeur D'Alene Lane, Suite B Payson, AZ 85541; and AHI- Casa Grande 803 N. Salk Dr., Bldg. B, Casa Grande, AZ 85122.

41. According to its website, AHI employs fifteen (15) physicians. http://www.azheart.com/?id=13&sid=2.

42. However, while Relator was on site, there were thirteen (13) physicians and one nurse practitioner.

43. While Relator was working on site at AHI, she discovered compliance issues regarding billing at levels higher than the services provided (i.e. upcoding);

billing for services that were performed by improperly supervised employees; and billing for services that were the results of payments for referrals through excessive compensation in violation of the Anti-kickback and Stark Statutes.

44. Relator brought these violations to Defendants' attention.

45. Despite having knowledge of these compliance issues, Defendants have neither self-reported nor taken action to correct these issues, resulting in continuing fraudulent claims being submitted to governmental payors.

46. Defendants' fraudulent practices date back to at least 2010 and are ongoing.

## REGULATORY FRAMEWORK

47. The federal False Claims Act provides that one who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a).

48. The Medicare Program is a health insurance program for individuals 65 years and older, certain disabled individuals under age 65, and people of any age who have permanent kidney failure. The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 *et seq*.).

49. The Medicaid Program is a joint federal-state program funded under Title XIX of the Social Security Act. 42 U.S.C. § 1396 *et seq*. As a prerequisite to enrollment as a provider in the Medicaid Program, providers are required to enter into provider agreements and agree, among other things, to comply with federal and state provider participation requirements as a condition of federal and state funding. 42 U.S.C. §

1396a(w).

50. Title XIX of the Social Security Act was enacted by Congress to establish the Medicaid Program. See 42 U.S.C. §§ 1396-1396(v). Medicaid is funded by both federal and state money, with the federal contribution capsulated separately for each state. See 42 U.S.C. §§ 1396(d) and 1396(D)(b).

51. HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program, as well as for the federal implementation of Medicaid.

52. Upon information and belief, Defendants derive a substantial portion of their revenue from the Medicare Program, as well as that of the Medicaid Programs.

53. Through their intentional and fraudulent actions as set forth in this Complaint, the Defendants knowingly caused the Government to pay false claims in violation of the Medicare rules, Stark, and the Anti-Kickback Statutes.

54. To receive reimbursement from Medicare for services provided to Medicare patients, a provider must be an approved participating provider in the Medicare program.

55. As a condition of participation in the Medicare Part B program, providers agree to be familiar with and abide by the program's reimbursement policies.

56. Medicare requires all payments (with only a few exceptions) made by Medicare to be for medically reasonable and necessary services.

**Upcoding Framework**

57. A provider who treats a Medicare patient is required to submit an electronic or hard

copy Medicare Health Insurance Claim Form ("HCFA Form 1500") to the carrier, which on behalf of CMS, pays for a portion of the claim.

58.     In submitting Medicare claim forms, providers must certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.

59.     The American Medical Association assigns and publishes numeric codes, known as Current Procedural Terminology ("CPT") and Healthcare Financing Administration Procedure Coding Systems ("HCPCS") codes. The codes are a systematic listing of procedures and services performed by healthcare providers.

60.     Healthcare providers and healthcare benefit programs such as Medicare use CPT and HCPCS codes to describe and evaluate the services for which they claim, and to decide whether to issue or deny payment.

61.     Each healthcare benefit program establishes a fee reimbursement for each procedure described by a CPT or HCPCS code.

62.     Medicare determines whether services are "medically reasonable and necessary" separately from determining whether the work described by a reported CPT code was performed.

63.     "E/Ms" are the evaluation and management coding name given to describe physician-patient interactions.

64.     Defendant AHI has upcoded and continues to upcode the E/M codes to artificially and fraudulently inflate its reimbursement from Government programs.

65.     For E/M services, the medical record documentation must demonstrate that the practitioner performed the reported E/M service as it is described in the CPT book

and as required by CMS E/M Documentation Guidelines.

66. Additionally, the documentation must support the intensity and frequency of the E/M service provided and which does not exceed the patient's clinical needs.

67. Information within the medical record about the patient's condition, not the diagnosis alone, determines the level of service payable by Medicare.

68. E/M codes are a range of numbers which in general correlate to a continuum of possible care which is generally ranked by level of interaction and intensity of service provided to the patient.

69. In general, the more complex the visit, the higher the level of code the provider may bill within the appropriate category and higher the reimbursement.

70. Thus, E/M codes designate whether it is a new patient or existing patient, as well as the setting in which the services are provided (e.g., hospital inpatient, private office, outpatient, nursing home, etc.)

71. E/M codes also have three key components which are used to select the appropriate level of E/M service provided: history, examination, and medical decision making.

72. Visits that consist predominately of counseling and/or coordination of care are an exception to this rule. For these visits, time is the key or controlling factor to qualify for a particular level of E/M services.

73. In order to bill any code, the services furnished must meet the definition of the code. It is the provider's responsibility to ensure that the codes selected reflect the services furnished.

74. There are five CPT codes available for E/Ms:  CPT 99211 through 99215.

75. CPT 99214 or level-IV is defined by CMS as an established patient visit as one

involving at least two of the three following components: a detailed history, detailed examination and medical decision making of moderate complexity.

76. Defendant AHI has been improperly designating patient visits as CPT 99214 to fraudulently maximize reimbursement from government payers.

## Upcoding at AHI

77. While in Arizona, Relator discovered numerous instances of upcoding involving CPT 99214.

78. The physicians at AHI systemically utilize CPT 99214 for their E/Ms regardless of whether the E/M meets the requirements for a 99214 code.

79. These upcoding instances have been identified as occurring and as being improper in numerous internal Vanguard Audits conducted of AHI's practice in 2012 and also in previous audits occurring at least one and half to two years ago.

80. These internal Vanguard audits were performed by Shelly Asbury, RMA, LM, CCS, CCS-P, CMRS, CCP, CPMA, Director, Physician Coding Compliance, Vanguard Health Systems.

81. The internal Vanguard Audits were discussed in numerous management meetings despite which the upcoding issues were not corrected because of concerns over upsetting the physicians and losing the referral business.

82. The August-September 2012 Audit noted serious upcoding issues including:

● "'…[P]rompting and instructing' providers on how… to document … to always reach a level 4 (99214/99204) Evaluation and Management Service;"

● Billing for complete Review of Systems (ROS) and Past Family Social History (PFSH) for established patients for every visit and reporting negative on the ROS forms when the questions were not even asked of the patient;

12

● Use of a drop down box on the medical record software for a "comprehensive examination" selection when the provider did not perform a comprehensive examination, resulting in charging a higher level of service than what was performed.

● Ancillary testing being performed without a signed provider order.

● Billing for a higher level of service than what was actually performed.

● documenting a comprehensive examination when no comprehensive exam was conducted.

83. In addition to upcoding to artificially and fraudulently increase reimbursements from governmental programs, the AHI physicians also upcode to increase their RVUs in order to maximize their bonus revenue.

84. This upcoding problem has been reported by internal auditors to Vanguard management, as well as by Relator, to no avail.

### Billing for not properly supervised services

85. Defendant AHI provides cardiac rehabilitation services, among other things.

86. Medicare covers cardiac rehabilitation services under the benefit category "services incident to a physician's professional services." Social Security Act 1861(s)(2)(B).

87. "Incident to" services must be provided under direct physician supervision.

88. The relevant regulatory text, as referenced in the NCD is:

> "Direct supervision" means the physician must be present and on the premises of the location and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." 42 CFR §410.27

### Unsupervised Services Being Performed and Billed at AHI

89. The Cardiac Rehab facility at AHI operates without direct physician supervision.

90. The cardiac rehabilitation services at AHI are performed by Registered Nurses

("RNs") or Cardiac Rehab Therapists ("CRTs").

91.     While on site at AHI in 2012, Relator performed a mid-afternoon walk-through tour of the Cardiac Rehab and there was not a single physician in the building.

92.     Yet, while there was not a single physician in the building, there were multiple patients in cardiac rehab sessions.

93.     It is a common occurrence at AHI to not have physicians on site in the building while cardiac rehabilitation services are performed on patients.

94.     Even though he was not in the building while cardiac rehabilitation services were being performed, AHI submitted cardiac rehabiliaton billing under Dr. Strumpf's provider number.

95.     AHI records of Strumpf's RVU summary for dates of service 1/1/12 – 6/30/12 show almost 2,000 different patient charges/billing/collections for E/M code 99499  under his provider number even when he was not present at AHI.

96.     These cardiac rehabilitation services were billed to governmental payors even through a physician was not on the premises as required by Medicare.

**Billing for work performed by "fellow" under AHI provider or NPI number**

97.     In addition to billing for cardiac rehabilitation services performed by nurses and therapists, not under the direct supervision of AHI physicians, AHI also employs persons that it terms "fellows.

98.     AHI bills for the hospital-based services performed by these "fellows" under AHI physicians' provider or NPI numbers, despite the lack of direct supervision over these "fellows."

**Regulatory Framework for Billing for physician services**

14

99. Under Medicare guidelines, the provider number or NPI number used to bill Medicare must accurately reflect who provides the services.

100. When services are provided by a physician, the physician's individual National Provider Identifier ("NPI") or provider number must be used.

101. There are exceptions to the above-requirements for *locum tenens* or for services that are provided by an intern or resident in a teaching program as defined by Medicare rules.

102. AHI neither has nor participates in a teaching program as that term is defined by Medicare rules.

103. Accordingly, these exceptions are not applicable to Defendants.

104. Effective May 23, 2008, all Medicare Part B claims must include an NPI in the primary and secondary provider fields.

105. The primary provider fields refer to the billing provider, pay-to-provider, and rendering provider fields. The secondary provider field refers to the attending/referring /ordering provider field.

106. A split/shared service is an encounter where a physician and an Non Physician Practitioner ("NPP") each personally perform a portion of an E/M visit.

107. In an office/clinic setting for encounters with established patients that meet incident to requirements, Medicare billing is reported the using the physician's National Provider Identifier (NPI).

108. For encounters that do not meet incident to requirements, billing is reported using the NPP's NPI.

109. For encounters in a hospital inpatient, outpatient, and ED setting, encounters shared

15

between a physician and a NPP from the same group practice can be billed to Medicare using either provider's NPI if the physician provides any face-to-face portion of the encounter.

110. If the physician does not provide a face-to-face encounter in the above-settings, billing to Medicare must be reported using the NPP's NPI.

111. Defendants VHS and AHI recruit physicians, often foreign-medical graduates, for short periods of employment of three, six and twelve months, for the alleged purpose of gaining visibility in other markets through those physicians after they leave.

112. Defendants term these physicians "fellows."

113. Neither Defendant AHI nor Defendant VHS have any fellowship training program in any of its Arizona operations.

114. These "fellows" are recruited through the Arizona Health Foundation (the fundraising arm of AHI).

115. The recruitment efforts are led through Defendant VPS.

116. The "fellows" are placed directly in the hospital setting where they provide services of the grunt-work variety for AHI physicians.

117. Although they never set foot in an AHI clinic, they are hired as employees of AHI and paid wages by AHI.

118. These "fellows" bill all of their services under AHI physician NPI numbers.

119. The services provides by these "fellows" are not under the direct supervision of the AHI physicians.

120. Relator complained about these practices with the "fellows" to management at AHI and VHS.

121. VHS management told Relator that no action would be taken regarding the "fellows" for fear of losing the referrals from the AHI physicians who benefit from the "fellows" work.

### Improper Compensation Inducements for Referrals

122. AHI physicians are paid above Fair Market Value ("FMV") in salary and bonuses and receive other unearned compensation to which they are not otherwise entitled under their Employment Agreement.

123. Defendants pay said above FMV compensation in return for AHI physician referrals to Vanguard-owned facilities.

124. Said compensation to AHI physicians violates the Anti-Kickback statute.

125. Said compensation to AHI physicians violate Stark.

### Regulatory Framework for Kickbacks

126. Congress enacted the federal healthcare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government.

127. The federal healthcare Anti-Kickback Statute provides that those who knowingly and willfully solicit or receive, offer or pay, receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal healthcare program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1).

128. Remuneration is the payment or provision of anything of value.

129. The Anti-Kickback Statute is violated where even <u>one</u> purpose of the payment is to induce referrals.

130. Any remuneration should be at fair market value for actual and necessary items

furnished or services rendered based upon an arm's-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

131. Arrangements under which physicians are (i) provided with items or services for free or less than fair market value; (ii) relieved of financial obligations they would otherwise incur, or (iii) provided with inflated compensation paid for items or services constitute kickbacks. OIG Supplemental Compliance Program Guidance for Hospitals, p. 4866.

132. The Anti-Kickback Statute and the OIG regulations have established a number of "safe harbors" for common business arrangements.

133. The referemced payments to AHI physicians do not fall within any of the safe harbors.

**Regulatory Framework for Stark**

134. Physicians are prohibited from referring Medicare or Medicaid patients for designated health services to entities in which those physicians have a financial interest. 42 U.S.C. §1395nn (Stark Law).

135. A "financial relationship" includes direct and indirect compensation arrangements.

136. An indirect financial relationship exists if the referring physician receives aggregate compensation from the entity with which the physician has a financial relationship that varies with the volume of referrals or if the compensation paid otherwise reflects the volume or value of referrals or other business generated by the referring physician. 42 C.F.R. §411.354(c)(2).

137. Stark contains an employment safe-harbor.

18

138.   Under the employment safe-harbor, compensation paid to a physician by an employer who has a bona fide employment relationship is permissible only if the following conditions are met:

1.   The employment is for identifiable services.

2.   The amount of the remuneration under the employment is:

    i.   Consistent with the fair market value of the services; and

    ii.   Except [for certain productivity bonus arrangements], is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician; and

3.   The remuneration is provided under an agreement that would be commercially reasonable even if no referrals were made to the employer.

139.   Productivity bonuses based on services performed *personally* by the physician is generally acceptable.

140.   However, as explained herein, a substantial portion of the bonus compensation paid to AHI physicians is derived from services which are not personally performed or directly supervised by the physicians.

**Defendants are paying AHI physicians improper inducements for Referrals**

141.   AHI physicians receive inducements for their referrals which include excessive salary compensation (above fair market value) and excessive bonus compensation based on upcoding, billing for services not properly supervised, and unenforced Employment Agreements which allow AHI physicians to retain    unearned

compensation,

## Excessive Compensation above FMV

142. AHI's physicians are paid base-salaries that are higher than FMV.

143. AHI physicians also receive bonuses based on RVUs, sign on bonuses, and miscellaneous other bonuses, as well as very expensive dinners and alcoholic beverages for meeting attendance.

144. Defendants have knowledge that the salaries being paid to AHI physicians are higher than FMV.

145. MedAxiom, a comprehensive subscription-based service provider and information resource exclusively servicing cardiology practices was retained by Defendant MedSynergies to undertake an independent consulting review of the compensation being paid to AHI's physicians.

146. MedAxiom's review concluded that the salaries being paid to AHI physicians are above FMV.

147. Despite the findings of the independent consultant, Defendants made no changes to the physicians compensation for fear of losing the referrals.

### Bonus Compensation artificially increased as an incentive to refer.

148. AHI physicians receive, in addition to their salaries, a bonus based on their RVU utilization.

149. AHI physicians' bonus compensation is artificially inflated through improper billing practices.

## Artificially increasing bonus compensation through upcoding

150. As explained above, Defendants allow AHI physicians to artificially increase their RVUs through systemic upcoding.

20

151. The physicians at AHI systemically utilize CPT 99214 for their E/Ms regardless of whether the E/M meets the requirements for a 99214 code.

152. Despite the upcoding being identified as occurring and being improper in numerous internal Vanguard Audits, Defendants have allowed the upcoding and resulting excessive bonuses to continue in order to induce referrals.

**RVU credit for services not properly supervised to increase bonus compensation**

153. Additionally, as explained above, the AHI physicians are increasing their RVUs by being credited for claims for cardiac rehabilitation treatment and services submitted under their provider numbers for cardiac rehabilitation services which were supposed to be provided, but were not, under their direct supervision.

154. The foregoing confers additional unearned compensation to the physicians, which Defendants allow in order to induce referrals.

**Non-Enforcement of Employment Agreement Provisions allowing Physicians to keep other unearned compensation**

155. The AHI physicians have written employment agreements.

156. These written employment agreements contain terms and conditions regarding compensation.

157. The employment agreements contain express provisions regarding the paying back of compensation if certain productivity requirements are not met, including minimum clinical patient hours, or if the compensation exceeds fair market value.

158. AHI physicians are not being required to pay back unearned compensation as required in the employment agreements.

159. Defendants are aware that the AHI physicians are not entitled to the unearned

compensation, as well as of the requirements to repay such compensation, but do not enforce the contractual provisions in order to induce referrals from AHI physicians.

160. Upon information and belief, the above described improper and fraudulent practices occurring at AHI are occurring throughout Vanguard owned and controlled operations throughout the country.

## COUNT ONE-VIOLATIONS OF THE FALSE CLAIMS ACT - PRESENTATION OF FALSE CLAIMS

161. Relator realleges and incorporates paragraphs 1-148 as if fully restated herein.

162. In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval for payment by government funds in violation of 31 U.S.C. § 3729(a)(1)(A).

163. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT TWO- VIOLATION OF FALSE CLAIMS ACT – FALSE STATEMENTS

164. Relator realleges and incorporates paragraphs 1 - 161 of this Complaint as if fully set forth herein.

165. In performing the acts described above, Defendants acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

166. The United States, unaware of the foregoing circumstances and conduct of the

Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT THREE – CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT

167.    Relator alleges and incorporates paragraphs 1-161 as if fully restated herein.

168.    Defendants have conspired with one another to conceal, omit, and alter material facts in order to present, or cause to be presented false and fraudulent claims for payment by the United States of America in violation of *inter alia*, 31 U.S.C. § 3729(a)(1)(C).

169.    Defendants conspired together and knowingly and willfully withheld information specifically known to Defendants regarding the systematic fraudulent conduct in unlawful billing to the United States of America in violation of 31 U.S.C. § 3729(a)(1)(C).

170.    The Defendants' false and fraudulent claims and/or statements, omissions and non-disclosures, and other overt acts in furtherance of the conspiracy, have proximately caused harm and damaged the United States of America.

171.    In performing the acts described above, Defendants knowingly used false records and statements to conceal its obligations to reimburse the Federal Government for money improperly retained, in violation of 31 U.S.C. § 3729(a)(7).

172.    As a result of Defendants actions of improperly submitting claims for reimbursement to governmental programs they received funds to which they are not entitled, the United States has been deprived of the use of these monies and is entitled to treble damages in an amount to be determined at a trial on the merits, as required by the Federal False Claims Act, as well as a penalty of not less than

$5,500.00 and not more than $11,000.00 for each false claim or false statement used to conceal an obligation to reimburse Federal Government monies.

## COUNT THREE – ILLEGAL REMUNERATION

173. Relator alleges and incorporates paragraphs 1-161 as if fully restated herein

174. In light of the improper remuneration paid by Defendants and the resulting referrals and billing for referrals received by Defendants, all parties to the transactions have violated the Federal Anti-Kickback Act, 42 USC § 1320(a)-7(b), and the Stark laws, 42 U.S.C. §1395nn.

175. Therefore all charges submitted to Medicare and Medicaid as a result of said violations constitute false claims under the Federal False Claims Act and the United States Government has been damaged herein.

## RELIEF REQUESTED

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants as follows:

    a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

    b. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented and/or payment the Defendants wrongfully avoided paying to the United States;

    c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in

bringing and pressing this case;

d. That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That civil penalties of treble damages plus $50,000 be imposed for each violation of the Anti-Kickback Statute; and

f. That this Court award such other and further general, equitable, and legal relief as it deems just and proper.

## DEMAND FOR A JURY TRIAL

Relator demands a jury trial on all claims alleged herein.

Dated: February 27, 2013                    Respectfully submitted,


/s/ David W. Garrison
George E. Barrett
David W. Garrison
Scott P. Tift
Seth M. Hyatt
**BARRETT JOHNSTON, LLC**
217 Second Avenue North
Nashville, TN 37201
(615) 244-2202
(615) 252-3798 (fax)
gbarrett@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com
shyatt@barrettjohnston.com

J. Marc Vezina
Monica P. Navarro
Michelle D. Bayer
**VEZINA LAW, PLC**
280 N. Old Woodward Ave, Suite LL20
Birmingham, MI 48009
(248) 558-2700
(248) 232-1581 (fax)
jmv@vezinalaw.com
mnavarro@vezinalaw.com

mbayer@vezinalaw.com

*Attorneys for Relator*